## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                          No. CR 04-1685 JB

MARCOS SANCHEZ,

      Defendant.

## <u>MEMORANDUM OPINION</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress, filed January 21, 2005 (Doc. 20).  The Court held a hearing on this matter on April 5, 2005.  The Court took the motion under advisement and did not rule at that time, but on April 14, 2005, entered an order denying Sanchez' motion to suppress.  The purpose of this memorandum opinion and order is to more fully explain the Court's reasons for its decision.  The primary issues are: (i) whether Defendant Marcos Sanchez has standing to challenge the search of the vehicle; (ii) whether the officers conducted a lawful <u>Terry</u> stop of Sanchez' vehicle; and (iii) whether there was a valid search of the vehicle.  Because the encounter was justified at its inception and reasonable in scope, the Court will deny Defendant Marcos Sanchez' motion.

## <u>FACTUAL BACKGROUND</u>

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which

requires a judge to decide preliminary questions relating to the admissibility of evidence, including

the legality of a search or seizure and the voluntariness of an individual's confession or consent to

search.  See United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982).  In deciding such

preliminary questions, the other rules of evidence except those with respect to privileges do not bind

the Court.  See Fed. R. Evid. 1101(d)(1).  Thus, the Court may consider hearsay in ruling on a

motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

     1.    On July 25, 2004, a citizen stopped Albuquerque Police Department ("APD") Officers

David Jaramillo and Xavier Lopez, and told them that there was a male subject somewhere up the

block, striking a female.  See Transcript of Hearing at 6:7 - 7:12; id. at 41:17 - 42:11 (taken at April

5, 2005)(hereinafter "Transcript").[1]

     2.    This unknown witness told the officers that, somewhere in the neighborhood of Utah and

Southern Streets, she had seen a man wearing a gray shirt striking a female in the face.  See

Transcript at 22:12 - 23:1; id. at 41:25 - 42:20.

     3.    There was no suggestion that a weapon other than a hand was involved.  See Transcript

at 22:17-25; id. at 70:3-15.

     4.    The officers did not witness this alleged conduct.  See Transcript at 26:5-11.

     5.    The officers did not know the suspect's race or national origin.  They did not know if

he was tall or short, fat or slim, bald or long hair.  They did not know the color of hair or of beard,

if any.  The sum of the description was of a man with a gray shirt.  See Transcript at 22:17-25; id. at

70:3-15.

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

6.     When the officers, driving in separate police cars, arrived in the vicinity of Utah and Southern Street, they did not see a man beating a woman on the street.  See Transcript at 9:6-8; id. at 26:5-11.  Instead, the officers observed two vehicles -- a blue sedan and a white van -- attempting to leave a home located at 8103 Southern St.  See Officer Xavier Lopez' Police Report at 1 (dated July 25, 2004)(hereinafter "Police Report");  Transcript at 8:17 - 9:2; id. at 43:8-18; id. at 44:6-9.  According to Jaramillo, the vehicles were pulling away quickly.  See id. at 43:8-12.

7.     The officers observed neighbors pointing to the two vehicles that were pulling away.  See Transcript at 8:17-23; id. at 43:8-12.  Lopez testified, however, that there was nothing about the movement of the vehicles to indicate that they were engaged in mutual activity or that the vehicles' occupants knew each other.  See id. at 32:24 - 33:6.

8.     Lopez immediately stopped the white van; Jaramillo stopped the blue sedan near the residence.  See Transcript at 9:20 - 10:5; id. at 43:21 - 44:2.

9.     Lopez and Jaramillo stopped both vehicles out of a concern that the alleged victim and/or suspect were in one of the vehicles.  See Transcript at 9:10 - 10:7 (Lopez).[2]

10.     Lopez asked the white van's sole occupant, later identified as James Wicker, see Police Report at 1, to step out of the vehicle because he could not ascertain who was inside simply from looking through the vehicle's windows, see Transcript at 10:8-14.

11.     For officer safety reasons and because he was responding to an assault and battery report, Lopez conducted a pat down search of Wicker.  See Transcript at 11:3-9 (Lopez).  Before the pat down search, however, Lopez asked Wicker if he was armed.  See id. at 11:9-11.  Wicker

---

[2] In his brief, Sanchez contends that the police did not locate a victim at any time; however, at the evidentiary hearing, he offered no evidence to support this proposition.  See Defendant's Motion to Suppress ¶ 1, at 2.

responded that he had a handgun in his front pocket.  See id. at 11:21-22.  Accordingly, Lopez placed

Wicker in handcuffs and removed a .25 caliber handgun from Wicker's right front pocket.  See

Transcript at 11:24 - 12:2.

12.    Lopez then shouted to Jaramillo, who was a close distance away with the sedan, that

he had found a gun.  See Transcript at 12:12-18.[3]

13.    After a third officer, Dave Hinson, arrived on the scene to assist with the stop,[4]

Jaramillo  ordered the three occupants of the sedan out of the vehicle.  See Transcript at 46:5-11.

14.    Lopez remained with Wicker while Jaramillo and Hinson conducted their investigation

of the sedan.  See Transcript at 13:20 - 14:20.

15.    At the moment the police officers ordered the vehicle occupants out of the vehicles,

the encounter became an investigative detention.  See Response to Defendant's Motion to Suppress

at 7 (conceding this point).

16.    After ordering the occupants out of the sedan, for officer safety reasons and because

Lopez located a gun on Wicker, Jaramillo performed pat down searches of the sedan's three

occupants.  See Transcript at 13:20 - 14:7; id. at 47:17-19.

17.    Jaramillo located an empty gun holster in the back-seat passenger's waistband, later

identified as Sanchez.  See Transcript at 48:5-10.  Sanchez had been sitting behind the sedan's driver

---

[3] Jaramillo testified that, after hearing that Lopez discovered a gun in the van, he drew his firearm and had the sedan's occupants maintain their position in the vehicle.  See Transcript at 46:1-3. In his motion to suppress and at the evidentiary hearing, Sanchez did not address whether this transformed the stop into a "felony stop" of the sedan and, if so, the legality thereof.  Because Sanchez does not challenge this aspect of the detention, the Court need not consider it in its analysis.

[4] At some point, additional officers arrived to provide backup for Lopez and Jaramillo.  It is not clear from the testimony, however, at what point in the investigative detention they arrived or how many additional officers were present.

and owner, later identified as Nathaniel Cordova.  See id. at 46:19-24.

18.    Sanchez was wearing a gray shirt, which matched the description of the assault and battery suspect.  See Transcript at 53:19-23.

19.    Because Lopez located a highly concealable firearm on Wicker, Jaramillo and Hinson asked the sedan's occupants to remove their shoes so that the officers could check for other hidden weapons.  See Transcript at 54:11-16 (Jaramillo).

20.    Hinson located a small bag of a white substance, later identified as methamphetamine, in Cordova's shoe.  See Transcript at 54:16-21.[5]  After the discovery of the narcotics, Jaramillo asked for Cordova's consent to search the sedan.  See id. at 55:2-6.  Cordova first gave oral permission, and then signed a written waiver of rights form and a consent to search form.  See id. at 55:7-9.

21.    During the search, Hinson found a .22 caliber pistol underneath the driver's seat closer to the reach of the backseat passenger, Sanchez, than to the reach of the driver, Cordova.  See Transcript at 56:24 - 57:16.  Jaramillo testified that the firearm fit perfectly into the holster found in Sanchez' waistband.  See id. at 60:3-11.[6]

22.    Jaramillo then went to speak to some of the neighbors -- although he could not recall how many were present -- while Lopez remained with the four individuals who had been stopped. See Transcript at 14:25 - 15:10; id. at 63:22-24.  While Jaramillo was speaking with a neighbor,

_____

[5] The United States contends that Cordova admitted that the methamphetamine was his and that he had hid it in his shoe when Jaramillo stopped the sedan; however, at the evidentiary hearing, the United States offered no evidence to support this proposition.  See Response to Defendant's Motion to Suppress at 4.

[6] In its brief, the United States contends that, when questioned by the officers, both Cordova and Lane denied possession of the firearm and contended that they did not know that Sanchez had a gun; however, at the evidentiary hearing, the United States offered no evidence to support either of these propositions.  See Response to Defendant's Motion to Suppress at 4.

Sanchez said, "Fucking neighbors!" Police Report at 2. <u>See</u> Transcript at 15:14-16 (Lopez). Lopez informed Sanchez that the detention had nothing to do with the neighbors and that, rather, a passer-by had reported an assault and battery. <u>See id.</u> at 15:18-20. Sanchez, on his own accord and without any questioning, said to Lopez: "I have no reason to lie to you. I'm a convicted felon. I've done time. I'm retired." Police Report at 2. <u>See</u> Transcript at 16:22-25 (Lopez). He also denied hitting his girlfriend. <u>See id.</u> at 15:20 - 16:1.

23.    Based on the discovery of the firearm and Sanchez' statements to Lopez regarding his status as a conviction felon, Jaramillo arrested Sanchez for being a felon in possession of a firearm. <u>See</u> Transcript at 61:16 - 63:1 (Jaramillo).[7] The officers then transported Sanchez to the APD Southeast Substation where records confirmed that Sanchez was a convicted felon. <u>See id.</u> at 63:2-13.

24.    Sanchez was later booked on the federal charge of felon in possession of a firearm. <u>See</u> Indictment at 1.[8]

25.    Sanchez filed this motion to suppress as evidence against him all of the items seized from the vehicle in which he was a passenger, including, but not limited to, the firearm, and any and all statements that Sanchez made.

_____

[7] In its brief, the United States alleges that the officers arrested Cordova on a narcotics possession charge and that Lane and Wicker were later released, however, at the evidentiary hearing, the United States offered no evidence to support either of these propositions. <u>See</u> Response to Defendant's Motion to Suppress at 4. This finding, however, is not material to the Court's disposition of Sanchez' motion.

[8] In its brief, the United States maintains that the officers booked Sanchez into the Metropolitan Detention Center on the state charge of felon in possession of a firearm, however, at the evidentiary hearing, the United States offered no evidence to support this proposition. <u>See</u> Response to Defendant's Motion to Suppress at 4.

26.     At the suppression hearing on April 5, 2005, Officers Jaramillo and Lopez testified credibly about the events and statements described above.

## ANALYSIS

Sanchez has standing to seek suppression of the firearm found in the vehicle and all statements he made.  The investigative stop was, however, justified in its inception and reasonably related in scope to the justification for the investigative detention.  The Court will thus deny Sanchez' motion.

## I.     SANCHEZ HAS STANDING TO SEEK SUPPRESSION OF EVIDENCE OBTAINED DURING THE VEHICLE STOP.

Under United States v. Eylicio-Montoya, 70 F.3d 1158 (10th Cir. 1995), the United States Court of Appeals for the Tenth Circuit recognized the distinction between "passenger standing to directly challenge a vehicle search from passenger standing to seek suppression of evidence discovered in a vehicle as the fruit of an unlawful stop, detention, or arrest."  Id. at 1162.  A passenger lacks standing to challenge directly a vehicle search unless he has a "possessory []or a property interest in a vehicle."  Id. (quoting Rakas v. Illinois, 439 U.S. 128, 148 (1978)).  The Tenth Circuit, however, held that

> a passenger has standing to challenge a constitutionally improper traffic stop, detention, or arrest on Fourth Amendment grounds even though, when the seizure occurs, she has no possessory or ownership interest in either the vehicle in which she is riding or in its contents.  A passenger does not relinquish her Fourth Amendment interest in protecting herself from unlawful seizures merely because she chooses to ride in a vehicle in which she has no possessory or proprietary interest.

United States v. Eylicio-Montoya, 70 F.3d at 1164.

Sanchez challenges the legality of the initial detention and seeks to suppress all evidence seized as a result of the stop -- including the firearm and all statements by Sanchez.  Under United States v. Eylicio-Montoya, therefore, Sanchez has standing.

## II.    THE INVESTIGATIVE STOP WAS JUSTIFIED IN ITS INCEPTION AND REASONABLY RELATED IN SCOPE TO THE JUSTIFICATION FOR THE INVESTIGATIVE DETENTION.

According to Sanchez, it is not clear why the officers stopped the two vehicles.  See Defendant's Motion to Suppress ¶ 1, at 2.  Sanchez contends that the police reports suggest that the vehicles were being driven at a high rate of speed, but provide no other reasons for the stop.  See id. at ¶ 1, at 2.[9]  Lopez and Jaramillo testified that they stopped the vehicles based on the tip they received that an assault and battery was occurring on Southern St., on the fact that neighbors were pointing at the vehicles, and on the fact that the vehicles appeared to be attempting to leave quickly. Accordingly, the Court will treat the vehicles' stop as an investigative detention.  See Terry v. Ohio, 392 U.S. 1, 20 (1968); United States v. Davies, 94 F.3d 1465, 1468 (10th Cir. 1996).

To determine an investigative detention's constitutionality, the court must conduct a two-step inquiry.  See id. at 19-20.  First, the court must ascertain whether the police officers' detention was "justified at its inception."  Id. at 20.  The United States "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  Id. at 21.  The "facts must tend to show that the detainee has committed or is about to commit a crime."  United States v. Johnson, 364 F.3d 1185, 1189 (10th Cir. 2004).  Next, the court must consider whether the officers' actions were "reasonably related in scope to the circumstances" initially justifying the detention.  Terry v. Ohio, 392 U.S. at 20.  "At both stages, the

_____

[9] A review of the police report submitted into evidence, however, reveals that when he arrived on Southern Street, Lopez observed two cars leaving from 8103 Southern SE and neighbors pointing to the vehicles.  See Police Report at 1.  The police report does not, however, mention anything about the vehicles leaving at a high rate of speed.  See id.  Sanchez may be referring to information included in Jaramillo's police report, see Transcript at 53:3-4, but since Sanchez did not offer that report into evidence, this proposition cannot be corroborated.

reasonableness of the officer's suspicions is 'judged by an objective standard taking the totality of the circumstances and information available to the officers into account.'" United States v. Johnson, 364 F.3d at 1189 (quoting United States v. Lang, 81 F.3d 955, 965 (10th Cir. 1996)).

A.       THE DETENTION WAS JUSTIFIED AT ITS INCEPTION.

The United States alleges that the detention was justified at its inception because the officers received the anonymous tip, observed the two vehicles attempting to leave quickly, and saw the neighbors pointing at the two vehicles. Sanchez, however, contends that the initial stop was not justified because, based on the totality of circumstances, the officers "had no objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring." Defendant's Motion to Suppress ¶ 9, at 4.

In evaluating whether a situation rises to the level of reasonable suspicion, the court must review the "officer's conduct in light of common sense and ordinary human experience." United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997). Reasonable suspicion constitutes a "minimal level of objective justification," United States v. Sokolow, 490 U.S. 1, 7 (1989)(quoting INS v. Delgado, 466 U.S. 210, 217 (1984)), which is "considerably less than proof of wrongdoing by a preponderance of the evidence," id. The officers, however, must have more than an "inchoate and unparticularized suspicion or 'hunch.'" United States v. Fernandez, 18 F.3d 874, 878 (10th Cir. 1994)(citing United States v. Sokolow, 490 U.S. at 7; Terry v. Ohio, 392 U.S. at 27). The court should not engage in "unrealistic second-guessing of police officers' decisions" and should "accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." United States v. Villa-Chaparro, 115 F.3d 797, 801 (10th Cir. 1997)(quoting U.S. v. Alvarez, 68 F.3d 1242, 1244 (10th Cir. 1995)). The court, in determining

-9-

whether a detention was justified, looks at the totality of the circumstances.  See Oliver v. Woods, 209 F.3d 1179, 1188 (10th Cir. 2000)(holding that "even ambiguous behavior, susceptible to an innocent interpretation, may give rise to a reasonable suspicion of criminal activity depending on the totality of the circumstances"); United States v. McRae, 81 F.3d 1528, 1534 (10th Cir. 1996).

In Florida v. J.L., 529 U.S. 266 (2000), the Supreme Court of the United States addressed whether an anonymous tip was sufficient by itself to establish reasonable suspicion.  Id. at 268.  In Florida v. J.L., the police received a tip from an anonymous caller that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun."  Id.  Two officers, upon arriving at the bus stop, observed three black males, one of whom was wearing a plaid shirt.  See id. One of the officers frisked the young man wearing the plaid shirt and found a gun.  See id.  The Supreme Court noted: "Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct."  Id.  In rejecting the contention that, because the tip led to an accurate physical description of the defendant, it was sufficiently reliable, the Supreme Court held:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse.  Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity.  The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

Florida v. J.L., 529 U.S. at 272.  In United States v. Johnson, the Tenth Circuit explained why "anonymous tips trouble the courts."  364 F.3d at 1190.  The Tenth Circuit highlighted the concerns about the "motives of the tipster," as well as the tip's "level of specificity."  Id. at 1190-91.  As the Tenth Circuit explained: "Overly generic tips, even if made in good faith, could give police excessive discretion to stop and search large numbers of citizens."  Id. at 1191.

In <u>Florida v. J.L.</u>, the Supreme Court explained, however, that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'"  529 U.S. at 270 (quoting <u>Alabama v. White</u>, 496 U.S. 325, 327 (1990)).  In <u>United States v. Soto-Cervantes</u>, 138 F.3d 1319 (10th Cir. 1998), the Tenth Circuit identified one such situation.  <u>See id.</u> at 1323.  In <u>United States v. Soto-Cervantes</u>, an anonymous caller informed police that drug distribution activity was occurring at 517 Sunnyslope SE involving "Mexican nationals and a gr[e]y pickup truck."  <u>Id.</u> at 1321.  Two officers, one of whom knew of the neighborhood's reputation for drug activity, were dispatched to the location.  <u>See id.</u> At the scene, they observed a gray truck and four or five individuals, including the defendant, matching the caller's description.  <u>See id.</u>  As the officers arrived, one of the individuals quickly walked behind a wall and then returned a few moments later.  <u>See id.</u>  The officers then detained the individuals to investigate the alleged drug activity.  <u>See id.</u>  During the detention, the officers searched the area, patted the individuals down, and asked them for identification.  <u>See id.</u>  While examining the defendant's alien registration card, the Immigration and Naturalization Service (INS) agent called to the scene became suspicious because of serious discrepancies between the numbers on the front and back of the card and the fact that the card had been issued three times.  <u>See id.</u>  Based on these suspicions, the INS agent ran an immigration check on the defendant and discovered that he had been deported following an aggravated felony conviction.  <u>See id.</u>  The officers then arrested the defendant for reentering the United States after being convicted of an aggravated felony, in violation of 8 U.S.C. § § 1326(a) and 1326(b)(2).  <u>See id.</u>

In rejecting the defendant's motion to suppress his alien registration card as fruit of an illegal detention, the Tenth Circuit held that the officers had the requisite reasonable suspicion to justify the

initial detention.  See id. at 1322-23.  While noting that the anonymous tip was "too general to support reasonable suspicion by itself," the Court held that it could, however, be included as a factor for consideration.  Id.  Thus, based on the totality of the circumstances, including the anonymous tip, the neighborhood's reputation, and the individual's brief disappearance behind the wall, the Tenth Circuit held that the officers had "reasonable suspicion to detain the men long enough to determine whether they were in fact engaging in drug activity."  Id. at 1323.

The Court, therefore, must analyze whether the information available to Lopez and Jaramillo at the time they effectuated the stop of the vehicles was closer to those in Florida v. J.L. or those in United States v. Soto-Cervantes.  Similar to the facts both in Florida v. J.L. and in United States v. Soto-Cervantes, Lopez and Jaramillo received from the anonymous tipster only a general description of the suspect's appearance -- that he was wearing a gray shirt -- and a general location -- that the assault and battery was occurring on Southern St.  Were this the only information available to the officers at the time they conducted the investigative detention, under both Florida v. J.L. and United States v. Soto-Cervantes, the initial detention would likely have been unjustified as lacking reasonable suspicion.

Although the officers did not observe a man beating woman when they arrived in the vicinity of the alleged attack, they did, however, observe two vehicles attempting to leave a residence quickly and a group of neighbors pointing at the vehicles.  This additional evidence distinguishes these facts from those in Florida v. J.L., where the officers detained the defendant based solely on the tipster's description of a young black male in a plaid shirt.  As in United States v. Soto-Cervantes, where the officers detained the defendant based on several factors, here, Lopez and Jaramillo stopped the vehicles based not only on the anonymous tip, but also on the neighbors' pointing and the vehicles'

suspicious rate of speed.  Thus, in keeping with the holding of <u>United States v. Soto-Cervantes</u>, this Court finds that the additional evidence provided Lopez and Jaramillo with the "indicia of reliability" necessary to corroborate the anonymous tip.  Moreover, by having the neighbors point out the van and the sedan, the <u>United States v. Johnson</u> Court's concern that the police would, based on the tip, detain a large number of men on Southern St. is greatly alleviated.

Thus, this Court concludes that based on the totality of the circumstances the officers had a reasonable suspicion that the assault and battery suspect and/or victim were inside one of the two vehicles, and, therefore, the initial stop of the vehicles was justified at its inception.  <u>See</u> <u>United States v. Patch</u>, 114 F.3d 131, 134 (9th Cir. 1997)(holding that officers have the authority to briefly stop a moving vehicle to investigate a reasonable suspicion that its occupants are engaged in criminal activity).

**B.    THE OFFICERS' ACTIONS DURING THE STOP WERE REASONABLY RELATED IN SCOPE TO THE JUSTIFICATION FOR THE <u>INVESTIGATIVE DETENTION</u>.**

In addition to being justified at its inception, the Court must also determine if the detention was "reasonably related in scope to the circumstances which justified the interference in the first place."  <u>Terry v. Ohio</u>, 392 U.S. at 20.  "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"  <u>United States v. Perdue</u>, 8 F.3d 1455, 1462 (10th Cir.1993)(quoting <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983)).

After a lawful stop of a vehicle, an officer may order the occupants, including passengers, to exit the vehicle.  <u>See</u> <u>Maryland v. Wilson</u>, 519 U.S. 408, 415 (1997); <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 110-11 (1977).  The Tenth Circuit

ha[s] stated that "[s]ince police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a <u>Terry</u>] stop.'"   [<u>United States v.</u>] <u>Perdue</u>, 8 F.3d at 1462 (quoting <u>United States v. Hensley</u>, 469 U.S. 221, 235 (1985)).   "[T]he use of firearms, handcuffs, and other forceful techniques does not necessarily transform a <u>Terry</u> detention into a full custodial arrest--for which probable cause is required--when the circumstances reasonably warrant such measures." <u>United States v. Melendez-Garcia</u>, 28 F.3d 1046, 1052 (10th Cir.1994) (internal quotation marks omitted).   Such measures are warranted, however, only if "the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate."  <u>Id.</u> (internal quotation marks and citations omitted).

<u>United States  v. Shareef</u>, 100 F.3d 1491, 1502 (10th Cir. 1996).   As the Supreme Court has explained, an "officer [is] justified in conducting a limited search for weapons once he ha[s] reasonably concluded that the person whom he had legitimately stopped might be armed and presently dangerous." <u>Pennsylvania v. Mimms</u>, 434 U.S. at 111-12.   In <u>United States v. Lang</u>, 81 F.3d 955 (10th Cir. 1996), the Tenth Circuit held that the Task Force agents' "decision to conduct a pat down search was reasonable to protect the agents' personal safety." <u>Id.</u> at 966.   In so holding, the Tenth Circuit noted that one of the vehicle's occupants was believed to be a suspect for two armed robberies and for a robbery/murder.  <u>See id.</u>  Although this belief later proved to be mistaken, the agents nevertheless acted reasonably under the circumstances.  <u>See id.</u>  If, however, "police officers' actions exceed what is reasonably necessary under the totality of the circumstances, the stop may only be justified by probable cause or consent." <u>United States v. Melendez-Garcia</u>, 28 F.3d 1046, 1051 (10th Cir. 1994).

In this case, the Court finds that, in addition to being justified in its inception, Lopez and Jaramillo's detention of the two vehicles was also reasonably related in scope to the justification for the investigative detention.  First, according to <u>Maryland v. Wilson</u>, because the initial detention was

-14-

justified, the officers' actions in ordering the occupants out of the vehicles were reasonable.  See 519 U.S. at 415.  Moreover, because they had a reasonable suspicion that a violent crime suspect was inside one of the stopped vehicles, the officers were justified in conducting pat down searches of both vehicles' occupants for safety reasons.  See Pennsylvania v. Mimms, 434 U.S. at 111-12; United States v. Lang, 81 F.3d at 966.  Sanchez argues that, in conducting the pat down search of the sedan's occupants, the officers impermissibly "bootstrap[ped]" the gun's discovery on the van's driver onto the sedan's occupants' and vehicle's search.  Motion to Suppress ¶ 11, at 4.  This argument is without merit, however, because Jaramillo acted reasonably in ordering the sedan's occupants out of the vehicle and conducting pat down searches of the occupants regardless of what Lopez discovered on the van's occupant.  Thus, the officers' actions were reasonably related in scope to the justification for the investigative detention.

## III. BECAUSE THE INITIAL STOP WAS LAWFUL IN ITS INCEPTION AND IN ITS SCOPE, THE GUN AND THE STATEMENTS ARE ADMISSIBLE.

In his motion, Sanchez does not challenge the legality of the sedan's search.  Sanchez concedes the voluntariness of the sedan's search in his motion: "They obtained permission from the driver to search his vehicle."  Id. ¶ 3, at 2.  Moreover, the Court has concluded that the initial stop and detention do not constitute a Fourth Amendment violation.  The fruit of the poisonous tree doctrine is therefore inapplicable.  Thus, because Cordova, the owner of the blue sedan, gave Officer Jaramillo both oral and written consent to search his vehicle, because Sanchez does not challenge the legality of the vehicle's search, and because no Fourth Amendment violation preceded the vehicle's search, the gun found in the sedan is admissible.

The same is true of Sanchez' statements to Jaramillo.  In his motion, Sanchez does not allege

that Jaramillo violated his <u>Miranda</u> rights or otherwise acted in an unlawful manner when Sanchez made the statements.  Instead, Sanchez alleges that, "because the initial seizure and detention was illegal, evidence obtained as a result [of] that detention must be excluded as the fruit of the poisonous tree." <u>Id.</u> ¶ 31, at 15.  At the hearing, Sanchez asserted that his motion challenged the initial stop, thereby rendering all evidence obtained as a result of that stop illegal.  <u>See</u> Transcript at 65:11-14.  Having concluded that the initial stop and detention were lawful, Sanchez' statements are admissible.

Having found the detention justified in both its inception and scope, the Court, therefore, denies the Defendant's challenge to its legality, and holds that the gun found in the sedan and the statements made by the Defendant are admissible.

**IT IS ORDERED** that Defendant Marcos Sanchez' Motion to Suppress is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

David Iglesias
   United States Attorney
Roberto D. Ortega
   Assistant United States Attorney
Albuquerque, New Mexico

      *Attorneys for the United States*

Roger A. Finzel
   Assistant Federal Public Defender
Albuquerque, New Mexico

      *Attorney for the Defendant*

-16-